**UNITED STATES of America, Appellee,**

v.

**Reco Vondell JOHNSON, Appellant.**

**No. 93–3140.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 12, 1994.

Decided July 8, 1994.

---

David A. Reiser, Sp. Litigation Counsel, Public Defender Service, Washington, DC, for the District of Columbia, argued the cause for appellant. With him on the briefs were A.J. Kramer, Federal Public Defender, James W. Klein, Chief, Appellate Div., Public Defender Service for the District of Columbia, and Leigh A. Kenny, Asst. Federal Public Defender.

James A. Meade, Asst. U.S. Atty., Washington, DC, argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty., and John R. Fisher and Roy W. McLeese, III, Asst. U.S. Attys.

Elaine R. Jones and George H. Kendall, III, Washington, DC, were on the brief for amicus curiae NAACP Legal Defense and Educational Fund, Inc.

Before: WALD, SILBERMAN, and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge RANDOLPH.

Dissenting opinion filed by Circuit Judge WALD.

RANDOLPH, Circuit Judge:

Fulfilling his part of the bargain, Reco Vondell Johnson pled guilty to possession of 50 grams or more of cocaine base with intent to distribute (21 U.S.C. § 841(a)(1) & (b)(1)(A)(iii)).[1] The statutory penalty for this crime, which Johnson committed when he was nineteen years old, is imprisonment for 120 months to life. 21 U.S.C. § 841(b)(1)(A).

Under the United States Sentencing Guidelines, Johnson fell into criminal history Category V. His base offense level amounted to 29. The lines on the sentencing table intersected at 140 to 175 months' imprisonment. In 1993, the district court sentenced Johnson to 140 months.

Before his eighteenth birthday, Johnson repeatedly violated the criminal laws of the District of Columbia. The presentence report, in compliance with U.S.S.G. § 4A1.2(d),[2] relied on Johnson's extensive juvenile record to calculate his criminal history category. Nine of Johnson's ten criminal history points were for offenses he committed before his eighteenth birthday. In this appeal pursuant to 18 U.S.C. § 3742(a), Johnson challenges the Sentencing Commission's authority to use juvenile records to determine a defendant's criminal history category, the district court's failure to depart downward under U.S.S.G. § 4A1.3, and the Guidelines' alleged lack of neutrality with respect to socio-economic status and race.[3]

**I**

The Sentencing Commission has not identified the statutory basis for U.S.S.G. § 4A1.2(d)'s counting juvenile adjudications in a defendant's criminal history, but this is not fatal. *See United States v. Lopez*, 938 F.2d 1293, 1296–97 (D.C.Cir.1991). If any provision of the Sentencing Reform Act, reasonably interpreted, would support the guideline, we must sustain it. *See United*

---

1. In return, the government dismissed the remaining two counts of the indictment charging distribution of cocaine base (21 U.S.C. § 841(a)(1) & (b)(1)(A)(iii)), and possession with intent to distribute the drugs within 1000 feet of a school (21 U.S.C. § 860(a)).

2. U.S.S.G. § 4A1.2(d) provides:
   (d) Offenses Committed Prior to Age Eighteen
   (1) If the defendant was convicted as an adult and received a sentence of imprisonment exceeding one year and one month, add 3 points under § 4A1.1(a) for each such sentence.
   (2) In any other case,
   (A) add 2 points under § 4A1.1(b) for each adult or juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense;

(B) add 1 point under § 4A1.1(c) for each adult or juvenile sentence imposed within five years of the defendant's commencement of the instant offense not covered in (A).

3. Relying on *Baldasar v. Illinois*, 446 U.S. 222, 100 S.Ct. 1585, 64 L.Ed.2d 169 (1980) (per curiam), Johnson also argued that because judges alone conduct juvenile proceedings, counting "non-jury" juvenile adjudications in a defendant's criminal history score is unconstitutional. While this appeal was pending, *Nichols v. United States*, —— U.S. ——, 114 S.Ct. 1921, 128 L.Ed.2d 745 (1994), overruled *Baldasar*, thereby foreclosing Johnson's argument. *Nichols* held that an uncounseled conviction may be used to enhance a sentence. In light of *Nichols*, there is no reason why a constitutional non-jury juvenile adjudication may not be used in the same way.

*States v. Price*, 990 F.2d 1367, 1370 (D.C.Cir. 1993). Section 217(a) of the Sentencing Reform Act of 1984, 28 U.S.C. § 994(d)(10), directs the Commission to "consider" whether a defendant's "criminal history" should be treated as relevant "in establishing categories of defendants for use in the guidelines," and, if relevant, to take "criminal history" "into account."[4] Section 994(d) lists ten additional "matters, among others" for the Commission's consideration. In view of the "among others," the eleven items on the list do not exhaust the possibilities. *United States v. Booten*, 914 F.2d 1352, 1355 (9th Cir.1990). Other provisions of the Sentencing Reform Act give the Commission broad authority to formulate sentencing criteria. *See* 28 U.S.C. §§ 991, 994(a); *Mistretta v. United States*, 488 U.S. 361, 377, 109 S.Ct. 647, 657, 102 L.Ed.2d 714 (1989); *Price*, 990 F.2d at 1369. For instance, 28 U.S.C. § 991(b)(1) empowers the Commission to "establish sentencing policies and practices for the Federal criminal justice system that ... reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process...."

■ As Johnson sees it, U.S.S.G. § 4A1.2(d) exceeds the Commission's statutory authority. He asks how "criminal history" under § 994(d)(10) can include his juvenile offenses when D.C.CODE ANN. § 16–2318 states that a juvenile adjudication "is not a conviction of a crime."

Juvenile justice systems, in theory, focus on treatment and rehabilitation. *See In re Gault*, 387 U.S. 1, 15–17, 87 S.Ct. 1428, 1437–38, 18 L.Ed.2d 527 (1967). Juvenile crime is termed "delinquency" and those responsible for it are "youth offenders." Juvenile records are often sealed; juvenile convictions may later be set aside if the offender goes straight. *See Tuten v. United States*, 460 U.S. 660, 664–65, 103 S.Ct. 1412, 1415, 75 L.Ed.2d 359 (1983); *United States v. McDonald*, 991 F.2d 866, 871–73 (D.C.Cir.1993). As we said in *McDonald*, "[s]etting aside a conviction may allow a youth who has slipped to regain his footing by relieving him of the social and economic disabilities associated with a criminal record.... But if a juvenile offender turns into a recidivist, the case for conferring the benefit dissipates.... Society's stronger interest is in punishing appropriately an unrepentant criminal." 991 F.2d at 872. Under the D.C.Code, therefore, a court may take into account the defendant's juvenile record in determining his sentence for crimes he committed as an adult. D.C.CODE ANN. § 16–2331(b)(4).[5] The practice of considering prior juvenile adjudications at sentencing, a practice authorized in the Federal Youth Corrections Act, 18 U.S.C. § 5038(a)(2), *see Barnes v. United States*, 529 A.2d 284, 288 (D.C.1987), has long been accepted. *See Consideration of Accused's Juvenile Court Record in Sentencing for Offenses Committed as an Adult*, 64 A.L.R.3d 1291 (1975). A defendant with a juvenile record may not have been "convicted," but the defendant nevertheless "violated a provision of the criminal law," *Matter of W.A.F.*, 573 A.2d 1264, 1267 (D.C.1990).[6] The Sentencing Commission's mandate is to establish categories of defendants on the basis of factors bearing on punishment. 28 U.S.C. § 994(d). It would be strange therefore if the Commission departed from the practice just described by ignoring a defendant's record of juvenile delinquency. *See United*

---

4    (d) The Commission in establishing categories of defendants for use in the guidelines and policy statements governing the imposition of sentences of probation, fine, or imprisonment ... shall consider whether the following matters, among others, with respect to a defendant have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance— ...

(10) criminal history....

28 U.S.C. § 994(d)(10).

5.  Johnson views D.C.CODE ANN. § 16–2318 as a promise that juvenile adjudications will not be treated as a criminal conviction for any purpose, a view D.C.CODE ANN. § 16–2331(b)(4) flatly contradicts. *See also United States v. Bucaro*, 898 F.2d 368, 371–73 (3d Cir.1990); *United States v. Daniels*, 929 F.2d 128, 129–30 (4th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 201, 116 L.Ed.2d 161 (1991).

6.  The Guidelines exclude "juvenile status offenses and truancy" from criminal history calculation. U.S.S.G. § 4A1.2(c)(2). *See United States v. Miller*, 987 F.2d 1462, 1465–66 (10th Cir.1993).

States v. Carrillo, 991 F.2d 590, 594–95 (9th Cir.1993). Recidivism, so Congress and the Commission concluded, generally warrants increased punishment. Whether the Commission's guideline requiring juvenile offenses to be counted rests specifically on § 994(d)(10), or is a factor within the "among others" clause of § 994(d), seems to us of little moment. Since juvenile records are without doubt relevant, Barnes, 529 A.2d at 288, the Commission did not exceed its statutory authority in taking them into account when it established categories of defendants.

■ Johnson also attacks U.S.S.G. § 4A1.2(d) on the ground that it unreasonably fails to differentiate between juvenile adjudications and adult criminal convictions.[7] As the system now stands, a juvenile sixty-day sentence of confinement warrants the same number of points as an adult sentence of imprisonment for the same time. See U.S.S.G. §§ 4A1.1(b), 4A1.2(d)(2)(A). A juvenile sentence of less than sixty days is treated the same as an adult sentence of less than sixty days. See U.S.S.G. §§ 4A1.1(c), 4A1.2(d)(2)(B).

Juvenile delinquents achieve ignominy by committing crimes.[8] In re Gault, 387 U.S. at 24, 87 S.Ct. at 1442. Differences in society's response to youthful offenders and its response to adult offenders are not attributable to differences in the nature of their criminal acts. When yesterday's juvenile delinquent becomes today's adult criminal the reasons behind society's earlier forbearance disappear. The question before the sentencing court is what punishment to mete out to an adult criminal, not how to treat and rehabilitate a youthful offender. In light of the purposes of sentencing, see 18 U.S.C. § 3553(a)(2), the Commission's decision to give juvenile confinements or sentences the same weight as adult criminal imprisonments or sentences is not unreasonable. It is a method, rough to be sure, of measuring relative culpability among offenders and the like-lihood of their engaging in future criminal behavior. Those who have committed crimes after serving sixty days or more in a prison-like facility, whether they were then a juvenile or an adult, prove that they have not been deterred. See U.S.S.G. § 4A Introductory Commentary.

We recognize that generalizing about juvenile dispositions may give rise to difficulties. As we have said, U.S.S.G. § 4A1.2(d)(2) assigns two points for a juvenile "sentence of confinement" of sixty days or more. (Two points are also added for a sixty-day adult "sentence of imprisonment." U.S.S.G. § 4A1.1(b).) The Guidelines do not define "sentence of confinement." Under D.C.Code Ann. § 16–2320(c), judges may impose a wide range of dispositions on juveniles who are adjudged delinquent. The nature of confinement may vary considerably. Juveniles may be placed in foster care, or in group homes, or in residential treatment centers, or in secure prison-like facilities. There may, then, be cases in which an extensive "sentence of confinement" (say to a juvenile Outward Bound program) would not even be roughly equivalent to a sixty-day prison sentence. And it may be that the confinement ordered is not directly related to the gravity of the offense. Judges may, for instance, fashion a disposition on the basis of the juvenile's home environment, and the need to remove the individual from that setting. See Kent v. United States, 383 U.S. 541, 554–55, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1966).

Johnson raises these potential problems, but we do not resolve them. The district court assigned Johnson four points for two sentences of confinement of more than sixty days. On both occasions Johnson was ordered to Oak Hill Youth Center, the District of Columbia's secure commitment center. See District of Columbia v. Jerry M., 571 A.2d 178, 181 n. 6 (D.C.1990); Beyer, Brown & DeMuro, Report of the Jerry M. Panel Appendix I (submitted to the D.C. Superior

---

7. The only appreciable difference is that juvenile confinement more than five years distant from the commencement of the offense at issue is not counted, U.S.S.G. § 4A1.2(d)(2), while the cutoff period for adults is ten years. U.S.S.G. § 4A1.1(b) Application Note 2.

8. Under the D.C.Code, a judge in the Family Division of the D.C. Court system must determine that the juvenile committed a delinquent act beyond a reasonable doubt. D.C.Code Ann. § 16–2317(b)(1).

Court Mar. 11, 1987); *cf. In re Gault,* 387 U.S. at 27, 87 S.Ct. at 1443. Johnson did not contend, here or in the district court, that it is unreasonable, for the purpose of calculating criminal history, to equate more than sixty days in Oak Hill with an equivalent period of imprisonment. *Cf. United States v. Williams,* 891 F.2d 212, 216 (9th Cir.1989), *cert. denied,* 494 U.S. 1037, 110 S.Ct. 1496, 108 L.Ed.2d 631 (1990). Neither has he claimed that the length of his confinement was unrelated to his underlying criminal conduct, the details of which confidentiality precludes us from discussing. Accordingly, as to Johnson, there was nothing untoward about the Guidelines' use of a juvenile "sentence of confinement" in calculating his criminal history.

## II

■ Distinctions between juvenile dispositions and adult convictions and sentences of imprisonment may warrant a sentencing court's departing from the Guidelines' sentencing range pursuant to U.S.S.G. § 4A1.3 on the basis that the defendant's criminal history category "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." *See United States v. Davis,* 929 F.2d 930, 933 (3d Cir. 1991). While Johnson maintains that here the district court should have departed downward, a "sentencing court's discretionary refusal to depart downward is not reviewable on appeal." *United States v. Spencer,* 25 F.3d 1105, 1112 (D.C.Cir.1994). All that we may consider is Johnson's claim that the court misconstrued the scope of its discretion under U.S.S.G. § 4A1.3, *id.,* a claim resting entirely on the court's failure to say that Johnson's juvenile record was sufficiently serious despite his age at the time he committed the offenses. *Id.* That the court did not say more in its public opinion may be attributable to the fact that Johnson's juvenile records are under seal. At all events the court said enough to show that it correctly understood the scope of its discretion. The court observed that most of Johnson's criminal history was due to his juvenile adjudications; the court examined the individual components of Johnson's criminal history; and

the court assessed them in the context of his "long and varied experience with the criminal justice system." In evaluating Johnson's record, the court concluded—in language reflecting a correct understanding of U.S.S.G. § 4A1.3—"[i]t is regrettable, but certain, that nothing in Mr. Johnson's record has overrepresented his 'likelihood to commit further crimes.'"

## III

■ Congress directed the Sentencing Commission to "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socio-economic status of offenders." 28 U.S.C. § 994(d). According to Johnson, § 4A1.2(d) is not entirely neutral because there is "plentiful evidence that race and socio-economic status influence the process resulting in juvenile adjudications and orders of confinement."

"At all stages," Johnson states, "the juvenile process is characterized by a high degree of discretion. . . ." But the criminal justice system is also inherently discretionary: prosecutors may charge lesser crimes and accept plea bargains; juries may acquit altogether or convict of a lesser included offense; the executive has the power to grant clemency. If, because of discretion, the juvenile justice system is open to the influence of race and socio-economic status, the same may be said of the adult criminal justice system. *Cf. McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987); *Gregg v. Georgia,* 428 U.S. 153, 199 n. 50, 96 S.Ct. 2909, 2937 n. 50, 49 L.Ed.2d 859 (1976) (Opinion of Stewart, J.). If Johnson were right, if this rendered the Guidelines not "entirely neutral," it would follow that Congress meant to forbid consideration of *any* record of criminal conduct in sentencing. Obviously, Congress meant no such thing. Criminal history is to be taken into account, as it always has been.

Of course any punishment selected or augmented on the basis of race is impermissible. The Guidelines explicitly state that not only race, but also sex, national origin, creed, religion and socio-economic status, "are not

relevant in the determination of a sentence." U.S.S.G. § 5H1.10. On its face U.S.S.G. § 4A1.2(d) is neutral with respect to these factors. Johnson does not profess innocence of any of the offenses that make up his record, and he does not contend that he was discriminated against, in the sentence imposed by the district court or in the dispositions of the juvenile court. For Johnson, the Guidelines have fulfilled the mandate of neutrality set forth in § 994(d), and we therefore reject his complaint.

*Affirmed.*

WALD, Circuit Judge, dissenting:

Although I agree with my colleagues' rejection of Johnson's constitutional claim, I cannot assent to their resolution of his challenge to the rationality of § 4A1.2(d)(2) of the Sentencing Guidelines. This case calls into question the Sentencing Commission's policy of treating adult sentences and periods of incarceration like juvenile sentences and periods of confinement for purposes of calculating a defendant's criminal history score. To reach criminal history category V in Johnson's case, the district court followed the mandate of U.S.S.G. § 4A1.2(d), weighed juvenile confinement like adult incarceration, and automatically added nine criminal history points to Johnson's score for his several stints in a juvenile institution, the first of which occurred shortly after his fourteenth birthday.[1] I believe that the Commission's decision to treat juvenile sentences and confinement like adult sentences and incarceration for purposes of computing a criminal history score is a manifestly irrational exercise of its delegated discretion. My discomfort is not alleviated by the existence of a downward departure provision available only to the extent that in the judge's opinion the criminal history score *significantly* overrepresents a defendant's criminal predisposition. I find § 4A1.2(d) to be an impermissible reconciliation of conflicting policy interests, which should fall under the second prong of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).[2]

A.

At the outset, I note my agreement with the majority's apparent conclusion that Johnson cannot prevail under *Chevron's* first step. Johnson contends that the guideline equating juvenile confinement with adult criminal incarceration clearly violates D.C.Code § 16–2318, passed by Congress in 1970, which states that a juvenile disposition "is not a conviction of crime and does not impose any civil disability ordinarily resulting from a conviction." Although this provision is emphatic, a subsequent section, D.C.Code § 16–2331, provides that "the inspection of [juvenile case] records shall be permitted to ... any court or its probation staff, for purposes of sentencing the respondent as a defendant in a criminal case." Given that Congress sanctioned the use of juvenile dispositions in criminal sentencing in D.C.Code § 16–2331, it clearly did not resolve the issue of the treatment of a juvenile record in Johnson's favor under § 16–2318. Nor did Congress lay down any precise rules for cabining the Sentencing Commission's discretion to consider juvenile dispositions. The Sentencing Reform Act ("SRA") vests the Commission with latitude in defining the relevant criteria for sentencing. Section 994(d) charges the commission with considering the bearing of "criminal history," age, and nine other fac-

1. Without these additional points, Johnson would have been in criminal history category I and would have been sentenced to the mandatory minimum of 120 months, twenty months shorter than his actual sentence of 140 months.

2. We have long applied *Chevron* to challenges to the Sentencing Guidelines, and the majority does not appear to deviate from that practice. *See, e.g., United States v. Doe,* 934 F.2d 353, 359 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 268, 116 L.Ed.2d 221 (1991); *United States v. Shabazz,* 933 F.2d 1029, 1035 (D.C.Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d

451 (1991). Other circuits that have confronted the issue have also employed *Chevron. See, e.g., United States v. Merritt,* 988 F.2d 1298, 1309 & n. 7 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993); *United States v. Harper,* 932 F.2d 1073, 1077 (5th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 443, 116 L.Ed.2d 462 (1991); *United States v. Lewis,* 896 F.2d 246, 247 (7th Cir.1990); *United States v. Kelley,* 956 F.2d 748, 757 (8th Cir.1992) (en banc); *United States v. Johnson,* 998 F.2d 696, 697 n. 2 (9th Cir.1993).

tors on sentencing and expressly indicates that its list is nonexclusive. *See* 28 U.S.C. § 994(d).[3]

*Chevron's* step one, however, does not end the inquiry. Johnson loses at *Chevron's* first step because it is clear that Congress has not foreclosed the use of juvenile dispositions in sentencing. But it is equally clear that the government does not win at this juncture, either. Congress delegated to the Commission the authority to consider a wide variety of factors in formulating its guidelines. Congress did not, however, write the Commission a blank check. The specific intent of Congress with respect to the use of juvenile dispositions in sentencing is unclear. We cannot infer from congressional silence, however, an acquiescence in all possible balances that the Commission might strike. If, for example, the Commission determined to treat juvenile dispositions much *more* harshly than prior adult convictions, we would not hesitate to declare the Commission's actions irrational and violative of presumed congressional intent. The propriety of the balance actually struck by the Commission in this instance therefore depends on *Chevron's* second step, at which we inquire whether the Commission's scheme is a reasonable or permissible construction of the statute. This step is by no means toothless, and we have not hesitated to strike irrational agency interpretations at this juncture in the past.

*See, e.g., Fedway Assoc., Inc. v. U.S. Treasury,* 976 F.2d 1416, 1424 (D.C.Cir.1992); *Abbott Labs. v. Young,* 920 F.2d 984, 988 (D.C.Cir.1990), *cert. denied,* — U.S. —, 112 S.Ct. 76, 116 L.Ed.2d 49 (1991); *NRDC v. EPA,* 824 F.2d 1146, 1163 (D.C.Cir.1987) (en banc); *see also NRDC v. Reilly,* 976 F.2d 36, 42 (D.C.Cir.1992) (Silberman, J., concurring).

**B.**

As the majority recognizes, the Commission generally does not differentiate between juvenile and adult sentences or periods of juvenile confinement and adult incarceration.[4] Both result in automatic, as opposed to discretionary, increases to the baseline criminal history score. In substantially equating the two, I believe that the Commission has irrationally treated very different things similarly for purposes of enhanced punishment. As such, the Commission has gone further than I think Congress would permit in exercising its admittedly considerable discretion under the SRA.

The modern juvenile justice system, which traces its origins to the turn-of-the-century Progressive reform movement, is premised on assumptions and goals that are profoundly different from those of the adult criminal system.[5] *See In re Gault,* 387 U.S. 1, 14, 87

3. Congress did not define the term "criminal history" in § 994(d)(10). However, legislative history for the provision demonstrates that the "criminal history . . . factor includes not only the number of prior criminal acts—whether or not they resulted in convictions—the defendant has engaged in, but their seriousness, their recentness or remoteness." S.Rep. No. 225, 98th Cong., 1st Sess. 174, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3357. This term, as thus defined, is broad enough to encompass acts which, although committed by juveniles, would be criminal if committed by adults. *See United States v. Booten,* 914 F.2d 1352, 1354 (9th Cir. 1990). Accordingly, I reject Johnson's argument that there is *never* room for juvenile dispositions in computing a defendant's criminal history score.

4. The Commission does, however, in two respects draw a distinction: (1) juvenile sentences (and "adult" criminal sentences of under one year) factor into a criminal history score only if the defendant was "released from such confine-

ment within five years of his commencement of the instant offense," U.S.S.G. § 4A1.2(d)(2)(A); and (2) juvenile confinement of over a year adds only two points to a defendant's criminal history score, whereas adult confinement of over a year adds three points. These exceptions, neither of which are at issue in this case, do not alter my view of the rationality of the Commission's regulation.

5. As the Supreme Court recounted in *Gault,*

[E]arly reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was "guilty" or "innocent," but "What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career." The child—essentially good, as

S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967); David Dormont, Note, *For the Good of the Adult: An Examination of the Constitutionality of Using Prior Juvenile Adjudications to Enhance Adult Sentences,* 75 MINN.L.REV. 1769, 1776 n. 43 (1991). Since its inception, the juvenile court system has rested on the *parens patriae* assumption that "the purpose of [confinement is] to serve the best interest of the child by meeting his or her need for regenerative care and supervision." BARBARA FLICKER, REDUCING OVERCROWDING IN JUVENILE INSTITUTIONS 1 (1983). Unlike criminal punishment, which might be imposed in pursuit of retributive as well as rehabilitative objectives, the focus of juvenile confinement traditionally has been primarily, or even exclusively, on reforming and treating the offender. *See* Dormont, *supra,* at 1776. Under this approach, "the actual crime or offense that the juvenile commits should not affect the severity or length of the court's intervention, because each individual child's needs are different and courts cannot determine those needs in advance merely by looking at the committed offense." Dormont, *supra,* at 1778 n. 45 (citation omitted); *see also* Barry C. Feld, *The Transformation of the Juvenile Court,* 75 MINN.L.REV. 691, 695 (1991) ("Feld, *Transformation* ").[6]

Admittedly, a chasm has often separated theory from practice in this aspect of our justice system as in others. *See* Feld, *Transformation, supra,* at 695 (arguing that "the theory versus practice of rehabilitation" represents a "crucial disjunction[ ] between juvenile justice rhetoric and reality"); FLICKER, *supra,* at 2–3 (discussing gradual evolution away from strict treatment model).

Nonetheless, while the purposes of confinement in the juvenile and adult spheres may occasionally converge, they have never been congruent. *See* Barry C. Feld, *The Juvenile Court Meets the Principle of Offense: Punishment, Treatment, and the Difference It Makes,* 68 B.U.L.REV. 821, 848–49 (1988) ("Feld, *Punishment, Treatment* "). Two-thirds of the states continue to employ the offender-specific rehabilitation model, and in all states the initially distinct emphases of the juvenile and adult criminal systems have led to the development of a very different set of procedures and standards for confinement and incarceration. *See* Feld, *Transformation, supra,* at 695.

At present, the procedural landscape of juvenile and adult proceedings differs markedly. In *Gault,* 387 U.S. 1, 87 S.Ct. 1428, the Supreme Court recognized that sufficient stigma attached to delinquency to warrant the imposition of certain due process protections at delinquency proceedings. However, the Court expressly declined to mandate the full panoply of protections that attend criminal trials, in light of the differences in emphasis and severity of the two systems. *See* Dormont, *supra,* at 1779. To be sure, the Supreme Court has mandated that delinquency be adjudged "beyond a reasonable doubt," *In re Winship,* 397 U.S. 358, 365–68, 90 S.Ct. 1068, 1073–74, 25 L.Ed.2d 368 (1970); be subject to the double jeopardy bar, *see Breed v. Jones,* 421 U.S. 519, 529, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975); and be attended by notice of charges, the right to counsel, the right to confrontation of adverse witnesses, and the privilege against self-incrimination, *see In re Gault,* 387 U.S. 1, 33,

they saw it—was to be made "to feel that he is the object of [the state's] care and solicitude," not that he was under arrest or on trial. *Gault,* 387 U.S. at 15, 87 S.Ct. at 1437 (citations omitted).

**6.** Justice White's concurrence in *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), emphasized the treatment-punishment dichotomy:

Reprehensible acts by juveniles are not deemed the consequence of mature and malevolent choice but of environmental pressures (or lack of them) or of other forces beyond their control. Hence the state legislative judgment not to stigmatize the juvenile delinquent by brand-

ing him a criminal; his conduct is not deemed so blameworthy that punishment is required to deter him or others. Coercive measures, where employed, are considered neither retribution nor punishment. Supervision or confinement is aimed at rehabilitation, not at convincing the juvenile of his error simply by imposing pains and penalties. Nor is the purpose to make the juvenile delinquent an object lesson for others, whatever his own merits or demerits may be.... Nor is the authorization for custody until 21 any measure of the seriousness of the particular act that the juvenile has performed.

403 U.S. at 551–52, 91 S.Ct. at 1989 (White, J., concurring).

41, 55, 87 S.Ct. 1428, 1446, 1451, 1458, 18 L.Ed.2d 527 (1967).[7] Nonetheless, in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), the Court concluded that a juvenile delinquency proceeding was not a "criminal prosecution" within the meaning of the Sixth Amendment, and as such did not require a jury trial. *Id.* at 550–51, 91 S.Ct. at 1052.

Judges in most juvenile courts still enjoy a wide, virtually unchecked discretion over confinement decisions absent in the adult criminal context. *See* Feld, *Punishment, Treatment, supra* at 849–50 & Table I. Unlike the more rigid criminal model, "sentencing" in juvenile court varies from "open-ended, nonproportional and indeterminate, with the goal of rehabilitation or incapacitation," (two-thirds of states) to "determinate and proportional, with the objective of retribution or deterrence" (one-third). *Id.* at 834.[8] Most juvenile sentences remain indeterminate. Judges may choose among a wide variety of "sentencing" alternatives in these jurisdictions in response to the needs of particular defendants, including at-home probation, out-of-home placement in boarding schools, camps, group homes, or medical facilities, and institutional confinement.[9] *See generally id.* at 849. As Feld describes it, "[i]n the vast majority of indeterminate jurisdictions, the judge's sentencing power ends with a commitment to the state's juvenile correction agency. Thereafter, the juvenile correctional authority or a parole board determines when a youth should be released from custody." *Id.* at 850.

Juvenile dispositions are made by a judge, rather than a jury. Juvenile confinement, unlike adult incarceration, is still largely imposed on the basis of characteristics of the offender, rather than characteristics of the offense. The imposition and duration of juvenile confinement may be set irrespective of proportionality; irrespective of the sentence ranges for adult offenders. It is therefore not instructive of criminal history at all, in the substantial majority of states and the District of Columbia, to reveal that the defendant, as a juvenile, spent sixty days or more in juvenile confinement. It may simply mean that the juvenile lacked an adequate home or that the community lacked adequate services. Even in the minority of states adhering to an expressly punitive model of juvenile confinement, juvenile sentences are inherently a less reliable indication of criminal disposition than periods of adult imprisonment given the untrammeled discretion of the sentencer and the absence of a jury trial.

In light of these differences, I believe the Sentencing Commission strayed beyond permissible boundaries of interpretation in treating juvenile sentences and periods of confinement like adult sentences and periods of incarceration for purposes of automatic increase to the defendant's criminal history category. This court has long recognized that an agency acts irrationally when it

7. The Court has also required juvenile courts to hold a hearing and to provide a *statement of* reasons before transferring juveniles from their *jurisdiction to be prosecuted as adults, reasoning* that basic procedural rights are necessary in deciding the "'critically important' question whether a child will be deprived of the special protections and provisions of the Juvenile Court Act." *See Kent v. United States*, 383 U.S. 541, 553, 86 S.Ct. 1045, 1053, 16 L.Ed.2d 84 (1966).

8. In fact, some juveniles serve longer sentences than do their adult counterparts convicted of similar offenses. *See* Feld, *Punishment, Treatment, supra*, at 837. Feld cites as example the facts of *Gault:* charged with making "lewd phone calls," fifteen-year old Gault was committed to the State Industrial School "for the period of his minority"—*i.e.*, until age twenty-one. An adult convicted of a like offense would have faced a $50 fine and a maximum two-month jail sentence. Challenges to indeterminate sentenc-

ing based on equal protection are typically rejected on the grounds that delinquents receive "treatment," not "punishment." *Compare People v. Olivas,* 17 Cal.3d 236, 131 Cal.Rptr. 55, 59, 551 P.2d 375, 379 (1976) (limiting sentence of youths tried as adults to statutory maximum), *with In re Eric J.,* 25 Cal.3d 522, 159 Cal.Rptr. 317, 321, 601 P.2d 549, 553 (1979) (refusing to adhere to same maximum when sentencing youths as juveniles because of "treatment" orientation of juvenile confinement).

9. Section 4A1.2(d)(2)(B) prescribes one point "for each adult or juvenile sentence . . . not covered in (A)." Subsection (A), in turn, applies to "adult or juvenile sentence[s] to confinement of at least sixty days." The Commission apparently distinguishes between "sentences" and "sentences to confinement," and seems to include many if not all of a juvenile court's nonconfinement sentencing options within its compass under (B).

treats similarly situated parties differently. *See, e.g., New Orleans Channel 20, Inc. v. FCC,* 830 F.2d 361, 366 (D.C.Cir.1987); *Melody Music, Inc. v. FCC,* 345 F.2d 730, 733 (D.C.Cir.1965). We have recently recognized that "the converse is also true," and suggested that an agency may equally run afoul of reason by "failing to take account of circumstances that appear to warrant different treatment for different parties." *Petroleum Communications, Inc. v. FCC,* 22 F.3d 1164, 1172 (D.C.Cir.1994). I believe that this case illustrates that principle aptly. The Commission has irrationally attributed to Congress an intention to ignore the radically different purposes and functions of the juvenile and adult systems in computing a defendant's criminal history score (as well as the different level of blameworthiness that is attributable to a young teenager as compared to a legally mature adult). Unlike the majority, I cannot surmise that Congress would approve such an illogical and unfair construction.

Nor do I think it controlling, as the majority apparently does, that Johnson has not demonstrated with particularity that his own stints of juvenile confinement were incommensurate with periods of adult incarceration typically imposed for the same offense or that his sentences were actually imposed for reasons unrelated to the severity of his offenses.[10] Johnson has argued here and below that his juvenile dispositions may not be equated with criminal incarceration because, in the District of Columbia, juvenile sentences are statutorily required to be based largely on considerations unrelated to criminal culpability. That Johnson happened to be sentenced to confinement at Oak Hill, which may look a lot like prison, does not undermine his basic point that in the District (as in two-thirds of all other states), juvenile sentencing is still offender-specific and cannot, therefore, serve as a proxy for past culpability or future dangerousness. Because the district court extended his sentence twenty months by applying a guidance automatically treating juvenile and adult sentences alike, I believe that Johnson is entitled to challenge that guideline and that it

should be struck like any other irrational regulation on conventional *Chevron* grounds.

### C.

The departure provision, U.S.S.G. § 4A1.3, under which a district court may, after calculating a defendant's criminal history pursuant to § 4A1.2, depart downward to the extent that the criminal history category "significantly overrepresents" the defendant's actual criminal history, *see* U.S.S.G. § 4A1.3 p.s., *see also United States v. Clark,* 8 F.3d 839, 843 (D.C.Cir.1993), does not in my view cure the problem. I disagree with the Third Circuit's implication that the general departure provision—which of course is not specific to juvenile confinement and applies equally to adult sentences—provides an adequate safety valve for the injustice perpetrated by treating juvenile and adult sentences similarly. *See United States v. Davis,* 929 F.2d 930, 933 (3d Cir.1991). Obviously, the question is in large part a classic baseline problem. The Commission has chosen to ascribe undue weight *automatically* to each period of juvenile confinement. Only if, after according points for such periods (along with adult sentences), the district court finds that the points on aggregate "significantly overrepresent" the defendant's criminality or likelihood of recidivistic behavior as compared with others in his criminal history category may the district court engage in a lowering process. Barring such "significant overrepresentation," the presumption in the Guidelines is that juvenile sentences ineluctably lead to an increased sentence for the instant offense.

I do not believe that a standard that admits of exception only for significant overrepresentation of a defendant's total criminal history adequately takes into account the relative unreliability of using juvenile sentences as a barometer of past or future criminality or the manifest irrationality of equating all kinds of juvenile confinement with adult incarceration. The statutory regime by no means precludes the use of juvenile dispositions in subsequent criminal sentencing.

---

**10.** It is difficult to see how one could *ever* demonstrate that the length of a juvenile's confinement was or was not directly related to the severity of his conduct in a jurisdiction that employs indeterminate sentencing for juveniles.

Nonetheless, the Commission's regulation, which mandates the addition of a specific number of points for all juvenile sentences, regardless of the juvenile's age or circumstances motivating the sentence, represents an inexcusable refusal to pursue different treatment where justice and reason require it.[11] I do not believe this was the design of Congress, and accordingly must dissent.

11. Of course I do not mean to suggest that juvenile records may not be properly employed in sentencing under the rubric of "relevant conduct." This is a different baseline, however, under which juvenile conduct may properly count only *if relevant* in time and substance to the immediate offense.